2020 IL App (1st) 181551-U

THIRD DIVISION
February 26, 2020

No. 1-18-1551

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| MARK OLIVER, | ) | |
| | ) | |
|       Plaintiff-Appellant, | ) | |
| | ) | |
|   v. | ) | |
| | ) | |
| RICHARD ISENBERG and GARY PLEASON, | ) | |
| | ) | Appeal from the |
|       Defendants-Appellees, | ) | Circuit Court |
| _____ | ) | Cook County |
| | ) | |
| THE COMBINED GROUP LLC, an Illinois limited | ) | |
| liability company, and COMBINED HOLDING GROUP, | ) | |
| INC., an Illinois corporation, | ) | 13 CH 15233 |
| | ) | 13 CH 17972 |
|       Plaintiffs-Appellees / Cross-Appellants | ) | (cons.) |
| | ) | |
|   v. | ) | |
| | ) | |
| MARK OLIVER, DANA SHOURD, WAYNE | ) | Honorable |
| HERMAN, SIGNATURE SALES & MARKETING, | ) | Michael T. Mullen, |
| an Illinois limited liability company, and ADVANCED | ) | Judge Presiding |
| SALES AND MARKETING, INC., an Illinois | ) | |
| corporation, | ) | |
| | ) | |
|       Defendants, | ) | |
| | ) | |
| (Mark Oliver, Appellant / Cross-Appellee). | ) | |

_____

    PRESIDING JUSTICE ELLIS delivered the judgment of the court.
    Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirmed in part, reversed in part, vacated in part, and remanded. Judgment that plaintiff breached fiduciary duty to corporation affirmed; finding that he breached fiduciary duty to LLC reversed. Because damages were calculated based on LLC's loss, award of damages vacated and cause remanded for recalculation of damages to corporation. Judgment finding restrictive covenant unenforceable affirmed. Judgment in favor of various defendants on remaining claims was not against manifest weight of evidence. Court did not abuse discretion by quashing third-party subpoena or denying attorney's fees.

¶ 2    Break-ups can be messy, and this case is no exception. Because of a serious business dispute, a previously prosperous business divided into three competing "factions." This appeal arises from the court's judgment on two of the factions' claims against each other. For the following reasons, we affirm in part, reverse in part, and remand for a recalculation of damages.

¶ 3                                    BACKGROUND

¶ 4    Before we delve into the facts, we applaud the trial court for its careful consideration and for its detailed discussion of the facts and the law in its written memorandum order. While we part ways with the trial court in one limited part of its ruling, our review was greatly aided by the trial court taking the time to lay out the information in such a clear and thorough manner.

¶ 5    The individuals and companies involved in this appeal are in the manufacturer's representative business. They help manufacturers sell their products to retailers, who in turn sell to consumers. From all accounts, they were good at their jobs and enjoyed a long, healthy, and prosperous business relationship—until in and around 2012.

¶ 6    Prior to 1999, Mark Oliver, Gary Pleason, Richard Isenberg, and Mr. Campbell (a non-party), merged their representative agencies to create a "combined" joint venture. In 1999, to bring junior "partners" into the business, they restructured their company. First, they created Combined Holding Group, Inc. (CHG). The four original partners were equal shareholders of

CHG. Around the same time, they also created The Combined Group LLC ("Combined") to act as their main business. Combined was a manager-managed LLC owned by CHG and each of the junior "partners." According to the operating agreements, CHG is the sole manager of Combined. In the beginning, CHG owned approximately 64% of Combined, with the remaining ownership interest apportioned among several other individual members—including Wayne Herman and Dana Shourd. Periodically, based on performance, CHG would sell part of its interest to bring in a new member or increase an existing member's interest.

¶ 7    Eventually, Mr. Campbell retired. After his retirement, Oliver, Pleason, and Isenberg still owned CHG equally— their interests increasing to one-third each. Each of the three men was also an officer and director of the corporation. In 2003, after Campbell retired, the members of Combined executed a First Amended and Restated Operating Agreement (Operating Agreement), the one at issue in this case. Many of these provisions would end up in dispute, but most pertinent to this case is the retirement provision, Section 8.6.

¶ 8    Section 8.6(a) requires that "[a] CHG Shareholder or Member (other than CHG)" must retire at the end of the Fiscal Year (defined as the calendar year) during which he turns 70. Once this occurs, subsection (b) provides: "In the event of a CHG Shareholder's or Member's Retirement having satisfied the requirements of Section 8.6(a) above and the Retirement Date precedes his withdrawal, *** then in liquidation of CHG's interest (with respect to such CHG Shareholder) or such Member's interest in the Company," the retiring individual will be entitled to a "Deferred Payout" and the balance of their Capital Account in "not more than sixty (60) equal monthly installments without interest thereon."

¶ 9    Section 8.6(c) qualifies their right to payment:

"Each CHG Shareholder and Member (other than CHG) hereby agrees on behalf of himself and his Affiliates that following his Retirement and for so long as he receives the Deferred Payout, he and his Affiliates will not directly or indirectly, either individually or as a principal, shareholder, member, partner, joint venturer, investor, employer, director, manager, officer, employee, consultant, agent, or in any other manner or capacity whatsoever, engage in, assist, or have any active interest in any business located anywhere in the United States that engages in any aspect of the Company's business (as described in Section 2.4(a) hereof or as it shall develop from time to time)."

¶ 10　Section 8.6 then acknowledges that the Company may seek injunctive relief for any breach or threatened breach but additionally states that

"each CHG Shareholder and Member further acknowledges and agrees that in the event of a breach or threatened breach of the restrictive covenant set forth in this section, the Company may, immediately and without further notice, cease to pay the Deferred Payout to CHG (with respect to such CHG Shareholder) or such Member."

¶ 11　Oliver was the first person subject to these mandatory retirement provisions. Under Section 8.6(a), he was required to retire on December 31, 2012. In the summer of 2011, in anticipation of his retirement, Oliver started trying to organize a transition plan for his Ace Hardware accounts. His plan was to bring in a veteran employee of Ace, so there would be an established relationship. At trial, Pleason and Isenberg testified that they planned to transition the Ace accounts to existing members—particularly Herman and Shourd. Oliver did not believe that those two had the time to devote to Ace. For months, Oliver tried to persuade Pleason and Isenberg to allow this Ace employee to join Combined. The three were not able to come to an agreement. Particularly, Pleason and Isenberg did not agree to Oliver's demands to stay on for

five years as a "consultant" while he received his Deferred Payout. Oliver claims he needed to stay and help the transition to secure his retirement payments.

¶ 12     The inability to create a transition plan, to put it lightly, soured the parties' relationship by the middle of 2012. In fact, the relationship had deteriorated so badly that Oliver was not speaking with Pleason and Isenberg; nor were they attempting to speak with him. At the time of trial, the witnesses testified that they had not spoken, in person, for the last 6 months that Oliver was with the companies; although, there were some terse emails. As the trial court found, the situation that was about to unfold was largely because "these 'adults' had quite childishly continued to refuse to speak with each other."

¶ 13     By his own account, Oliver became increasingly concerned about Combined's viability as his retirement approached. This concern was only compounded by the fact that Combined lost a significant amount of business in 2011. He was concerned that if Combined did not "right the ship," they would be unable to pay his retirement. Due to his concern, Oliver began sleuthing into Combined's books and records in mid-2012. What he found disturbed him. Oliver testified that he became convinced that there was serious mismanagement—even bribery—that had been occurring for years.

¶ 14     Meanwhile, the tension between the CHG shareholders was palpable. Pleason and Isenberg began holding meetings with all of Combined's members—excluding Oliver. This led to Herman and Shourd becoming the go-between for Oliver on the one side and Pleason and Isenberg on the other. Herman and Shourd's approved "role" was disputed. They believed that Pleason and Isenberg authorized them to make a deal with Oliver. Pleason and Isenberg, on the other hand, testified that Herman and Shourd were only supposed to "talk" with Oliver to make him see reason.

¶ 15    Nearing the end of 2012, the discussions of the "Oliver issue" changed. This started when Oliver brought his evidence of mismanagement to Herman and Shourd's attention. This caused them to begin doubting Combined's continued viability as well. In November, at a meeting with all of Combined's members, Oliver, Herman, and Shourd confronted Pleason and Isenberg with Oliver's evidence. This accusation further strained already deteriorated relationships. Due to the ever-increasing acrimony, in mid-December 2012, the members decided to hold a mediation to resolve their issues.

¶ 16    The mediation turned out to be a "complete disaster." Tempers flared and the mediation "ended with the exchange of angry words and even physical threats." As fate would have it, Herman and Shourd ended up on the same train home. It was here, on the train, that they came to a consensus: they could not stay with Combined. The consequences and *misunderstandings* surrounding this decision form the crux of this case. From December 16 onward, Combined was essentially split into three camps: Pleason and Isenberg; Herman and Shourd; and Oliver.

¶ 17    On December 16, Herman and Shourd met with Oliver to inform him of their decision to leave Combined. They asked Oliver if he would join them, and he agreed to but *only* under very specific circumstances. Oliver's primary concern was his retirement. He made it clear that he would not be a partner at their new company and instead would work until the transfer of his business was stabilized. Additionally, they had to pay him his entire retirement—the Deferred Payout and capital account amount—within one year instead of five. And finally, the critical issue in this case, Pleason and Isenberg had to agree to an "amicable" split of Combined.

¶ 18    For the first time, on December 19, Herman and Shourd informed Pleason and Isenberg that they were leaving effective January 1, 2013. Herman and Shourd said that they informed Pleason and Isenberg that they wanted to discuss an "amicable" split of the company. In

Pleason's and Isenberg's eyes, Herman and Shourd were leaving the company regardless of an amicable split—end of story. Regardless of Herman and Shourd's tenor, the evidence was uncontradicted that, from this point on, the parties negotiated about how to split the company.

¶ 19    To Herman and Shourd, the split was obvious. Each partner/representative at Combined specialized in a specific area. For example, Oliver, Herman, and Shourd were responsible for Hardware accounts. On the other hand, Pleason and Isenberg had responsibilities for Automotive and Electronic accounts. While their respective accounts were focused in these areas, Combined did not account for monies by "division" or account areas. Instead, all the money went in and out of "one big pot." In Herman's and Shourd's eyes, because their accounts were distinct, this was an obvious split. Pleason and Isenberg agreed that the majority of the accounts were in distinct areas but explained that some accounts weren't so clear-cut because the retailer had multiple streams in different areas—for example, hardware *and* automotive. Because of the significance of any decision to split the company, the meeting on the 19th was continued until December 21.

¶ 20    What happened over the next two meetings, on December 21 and 28, was hotly contested at trial and greatly influenced the outcome of this case. For the sake of brevity, we only discuss the gist of the opposing accounts. No notes were taken on what happened during these meetings, though there are some e-mails which shed some light on what was discussed.

¶ 21    Herman and Shourd believed that, between two meetings on December 21 and 28, they entered into an "amicable" "handshake agreement" with Pleason and Isenberg to split Combined. It is undisputed that after meeting on the 21st, Herman and Shourd put together a written document that contained the terms of the parties' "agreement." Herman and Shourd believed this writing was merely to commemorate the parties' agreement in case they needed to reference it

later. Although the written document was called a "proposal," the two were adamant that a deal had been struck.

¶ 22    For their part, Pleason and Isenberg agreed that much of the big-picture deal to split Combined had in fact been discussed, and there was some consensus, but they unequivocally required it to be put in writing first so that their lawyer could review it. Based on their trial testimony, they made it clear to Herman and Shourd that there was no deal, and there would not *be* a deal, unless and until the parties had a written agreement. It is also undisputed that both of the "written documents" sent to Pleason and Isenberg were rejected. Ultimately, the court found Pleason and Isenberg's testimony to be credible and concluded that there was no agreement between Herman, Shourd, Pleason, and Isenberg to split Combined.

¶ 23    Meanwhile, Oliver was not, at least directly, part of these negotiations. However, he did claim to have a contingent agreement with Herman and Shourd. At that point in time, Oliver's primary concern was making sure that he got his retirement payments. He was not particularly concerned with *who* paid them, so long as someone did. As noted above, he struck a deal with Herman and Shourd that, so long as there was an amicable split, he would transfer his business and accept the retirement payments from Herman and Shourd. In fact, Herman's and Shourd's written proposals contain provisions to that effect.

¶ 24    Oliver was not personally aware of what was happening in the negotiations between Herman and Shourd, on the one side, and Pleason and Isenberg, on the other. Instead, he relied solely on what Herman and Shourd told him. And consistent with what they believed, they repeatedly assured him that they had an amicable deal to split the company. Oliver did not doubt them, but neither did he *completely* accept their word. On December 30, 2012, Oliver tried to

confirm with Pleason and Isenberg that there was a deal. Neither of them responded. Oliver testified that he interpreted the lack of response as an agreement that the deal had been struck.

¶ 25    On January 1, 2013, Oliver, Herman, and Shourd left Combined. Herman and Shourd *immediately* began operating their new company, Signature. By January 10, nearly all of Oliver's, Herman's, and Shourd's accounts ended their relationship with Combined and began working with Signature. The big exception was Saleslink, a separate representative company owned by Combined and another representative company. It is undisputed that Herman and Shourd attempted to dissolve Combined's interest in Saleslink *before* they left on January 1. They claimed to have done so because it was part of the deal. Oliver acknowledged that he was aware that Saleslink was critical to the viability of Signature, and thus to his retirement. After January 1, he attempted to help Herman and Shourd get Saleslink transferred to Signature—to no avail. Ultimately, Saleslink was not transferred, and Combined sold its interest to the other representative company that co-owned it.

¶ 26    By the end of January 2013, all of Oliver's accounts had transitioned to Signature. Pleason and Isenberg considered Oliver in breach of the non-compete provision of the Operating Agreement and informed him that they would no longer be paying him his Deferred Payout. (Recall that Section 8.6 allowed the company to cease such payouts in the event of a breach of the non-compete covenant; see *supra* ¶ 9.)

¶ 27    Over the next year, Oliver's relationship with Signature, Herman, and Shourd also deteriorated because they were unable to pay Oliver his retirement as promised. Because of this, Oliver left Signature and started his own representative company, defendant Advanced Sales and Marketing.

¶ 28    In 2013, the parties sued each other over the hostile breakup of Combined. The factions broke down like this: (1) Herman, Shourd, and their new company, Signature; (2) Pleason, Isenberg, CHG, and Combined; and (3) Oliver and his new company, Advanced Sales and Marketing. But while Herman and Shourd are important players in the narrative, none of the claims by or against them are before us on appeal, as their appeals were voluntarily dismissed pursuant to settlement. Our focus is thus on the claims between the other two factions—CHG's and Combined's claims against Oliver, and Oliver's claims against Pleason and Isenberg.

¶ 29    The gist of CHG's and Combined's claims was that a deal for a split of Combined never occurred, and instead Herman, Shourd, and Oliver stole Combined clients in an improper manner. CHG and Combined sued Oliver for breach of fiduciary duty, conspiracy to commit a breach of fiduciary duty (with Herman and Shourd), and aiding and abetting Herman and Shourd in their breaches of fiduciary duty. CHG and Combined also sought a declaration that Section 8.6—the non-compete provision—was enforceable and had been breached.

¶ 30    Oliver claimed breach of fiduciary duty against Pleason and Isenberg. This claim contained multiple theories including corporate oppression, waste, improperly withholding the deferred-payout payments, and bribery (the latter of which was dismissed before trial).

¶ 31    The case was tried to the bench. At the conclusion, the circuit court entered an order containing extremely detailed factual and legal findings. The most critical finding was that there was no oral or written agreement to split Combined before Oliver left the company (or, for that matter, ever). It is primarily from that conclusion that the rest flowed.

¶ 32    As to CHG's and Combined's fiduciary-duty claims, the court found that Oliver breached a fiduciary duty to *both* CHG and Combined "by using more than just the general knowledge he acquired while working at Combined" to transfer his accounts to Signature. The court, relying on

Oliver's own testimony, determined it was "no easy task" to get manufactures to switch representatives, and that Oliver must have abused Combined's goodwill to cause such a rapid transition of business.

¶ 33 But the court found that Oliver was not liable for conspiracy or aiding and abetting Herman and Shourd. Although it determined that Herman and Shourd had specifically conspired to improperly leave and steal business from Combined, "[a]s to Oliver, the evidence was not clear and convincing that he reached the same agreement as Herman and Shourd." The court primarily based this on the fact that Oliver "had agreed to join Herman and Shourd *only if* they could reach an agreement with Isenberg and Pleason." (Emphasis in original.) Because Herman and Shourd told Oliver there was an agreement, the court did not believe that Oliver knowingly participated in the conspiracy. For that same reason, the court found that Oliver did not knowingly aid and abet Herman and Shourd's breach of fiduciary duty.

¶ 34 On the declaratory-judgment claim, the circuit court found that the non-compete provision was unenforceable as a matter of law. It determined that the restrictive covenant failed to impose a reasonable restriction. The court found that the provision was not ambiguous and "as written prohibits a retiring member or CHG shareholder for a period of five years from working in *any* capacity for a company located in the United States which engages in *any* aspect of Combined's business." The court concluded that Section 8.6(c) is "a blanket prohibition on competition and is therefore unenforceable as a matter of law." The court refused to exercise its "blue pencil" discretion and modify the language. Instead, it struck Section 8.6(c) in its entirety.

¶ 35 On Oliver's claims, the court found in favor of Pleason and Isenberg. It determined that Oliver no longer had standing to bring a shareholder-oppression claim—since he was not a shareholder of CHG after January 1, 2013. The court also found that Oliver failed to prove that

Pleason and Isenberg had made improper payments to themselves or MarketVision. Finally, although the court recognized that Oliver was ultimately entitled to the Deferred Payout (because Section 8.6 was unenforceable), it found that Pleason and Isenberg's refusal to pay it was reasonable, at the time, in light of the fact that Section 8.6(c) expressly allowed them to withhold the Deferred Payout.

¶ 36    The court found that Combined had sustained a total of $2.3 million in damages. This amount included *all* business taken by Oliver, Herman, Shourd. The court initially determined that "Herman, Shourd, Signature, and Oliver are each jointly and severally liable to Combined." However, in his post-judgment motion, Oliver argued that the damages were "readily ascertainable," and joint and several liability was inappropriate. On reconsideration, the court agreed and found that the damages Combined suffered that were ascertainable to Oliver were $687,514.00.  (And since this appeal does not include Herman or Shourd, this is the only portion of the judgment that concerns us.)

¶ 37    Oliver, CHG, and Combined appealed.

¶ 38                                    ANALYSIS

¶ 39                              I. Claims Against Oliver

¶ 40    We begin with Oliver's appeal. He first challenges the judgments entered against him for breach of fiduciary duty. He claims that he didn't owe Combined a duty at all, as a matter of law. He concedes he owed a fiduciary duty to CHG but claims that he didn't breach it, and the trial court's finding to the contrary was against the manifest weight of the evidence. He further claims that, if he did commit a breach, the court erred in calculating damages.

¶ 41     As to his own claims, Oliver says the court erred in finding against him on his breach-of-fiduciary-duty claims against Pleason and Isenberg. Finally, he argues the court abused its discretion by quashing a third-party subpoena. We take each argument in turn.

¶ 42                              A.  Breach of Fiduciary Duty

¶ 43     The existence and scope of a fiduciary duty are questions of law. *AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill. App. 3d 17, 33 (2005). Our review is *de novo. 231 W. Scott, LLC v. Lakeside Bank*, 2017 IL App (1st) 161131, ¶ 30. Fiduciary duties arise because of a relationship between the parties. *Miller v. Harris*, 2013 IL App (2d) 120512, ¶ 21. These relationships "may arise as a matter of law, such as between agent and principal or it may be moral, social, domestic, or personal based on the particular facts." *Garrick v. Mesirow Financial Holdings, Inc.*, 2013 Il App (1st) 122228, ¶ 32.

¶ 44     We review the factual basis of the court's judgment to determine if it is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arrendondo*, 2011 IL 111871, ¶ 12. A finding is against the manifest weight of the evidence when the opposite conclusion is apparent or the judgment is unreasonable, arbitrary or not based on the evidence. *Northbrook Bank & Trust Co. v. Abbas*, 2018 IL App (1st) 162972, ¶ 41.

¶ 45                              1. Oliver's Fiduciary Duty to Combined

¶ 46     The circuit court determined that Oliver owed a fiduciary duty to Combined in one of two ways. First, it determined that Oliver owed duties as an "agent/employee of Combined." Second, it found that Oliver was a "manager/officer of Combined."

¶ 47     The existence and scope of a fiduciary duty owed to a corporation obviously depends on the status of the individual who is claimed to owe that duty. See, *e.g.*, *Veco Corp. v. Babcock*, 243 Ill. App. 3d 153, 160-61 (1993) (contrasting fiduciary duty owed by employee with that of

officer). So before we go any further, we must identify the precise status of Oliver vis-à-vis Combined. And to do that, we must start with Combined, itself.

¶ 48    Under the Limited Liability Company Act, 805 ILCS 180/5-1(b) (West 2012) (the LLC Act), a limited liability company (LLC) must have at least one "member." And an LLC is presumptively deemed to be a "member-managed" LLC. *Id*., § 15-1(a). In such an LLC, the affairs of the LLC are decided by a majority vote of the members. *Id*., § 15-1(b)(2).

¶ 49    But if an LLC's operating agreement so provides, the LLC may instead be a "manager-managed" LLC. *Id*. And it is undisputed that the Operating Agreement for Combined so provided. Thus, it is undisputed that Combined was a manager-managed LLC.

¶ 50    The "manager" of a manager-managed LLC, generally speaking, has the exclusive authority to decide "any matter relating to the business of the company." *Id*., § 15-1(c)(2). The manager may be one or more individuals or any number of business associations, including a corporation. See *id*., § 1-5 (defining "manager" as a "person," and defining "person" as including any number of business organizations, including a "corporation"). A manager must be "designated, appointed, elected, removed, or replaced" by consent of a majority of the members. *Id*., § 15-3(c)(2).

¶ 51    The manager of a manager-managed LLC like Combined owes the LLC a fiduciary duty. *Id*., § 15-3(g)(2). That duty, broadly speaking, includes a duty of loyalty, a duty of care, and a duty of good faith and fair dealing. *Id*.; see also *id.* § 15-3(b), (c), (d).

¶ 52                        a. Oliver as Manager of Combined

¶ 53    So that's where the rubber first meets the road: The trial court found that Oliver, himself, was a manager of Combined, and thus he owed a manager's fiduciary duty to Combined.

¶ 54    It is undisputed that Combined's Operating Agreement provides that CHG is the manager of Combined. It's also undisputed that CHG is a corporation; more specifically, a closely-held corporation with three equal shareholders—Isenberg, Pleason, and Oliver. CHG was also the majority shareholder of Combined. (The "members" of Combined, such as Herman and Shourd, were minority shareholders.) There is no evidence that any individual—not Isenberg, Pleason, Oliver, nor anyone else—was every elected as an additional "manager," as the LLC Act requires. See *id.*, § 15-3(c)(2). Nor does Combined argue otherwise.

¶ 55    So the question is whether Oliver was properly identified as a "manager" of Combined, when the Operating Agreement only identifies CHG, and when no other manager was ever elected by a majority vote of the members.

¶ 56    The trial court thought so. The court reasoned that the actual manager, CHG, was a closely held corporation in which the individual shareholders (Oliver, Pleason, and Isenberg) treated the business like a partnership. Thus, the court concluded, for all intents and purposes, Oliver himself was a manager, too.

¶ 57    The finding that the individual shareholders treated CHG like a partnership is supported by the evidence. And that will be relevant in determining whether Oliver owed a fiduciary duty to CHG. But for the moment, we are considering whether he owed a fiduciary duty, as a manager, to *Combined*. And we can find no legal basis to support that conclusion.

¶ 58    It is no doubt true that a corporation acts through its individuals, so when the Operating Agreement permitted CHG "the sole and exclusive right to manage, control and conduct the affairs of [Combined]," it was effectively giving that authority to CHG's three shareholders, Oliver, Pleason, and Isenberg.

¶ 59    But that doesn't make Oliver a manager, himself. We cannot lightly shed the corporate form and impute it to the individuals making up the corporation. We are aware of no legal theory by which the law would invade the corporate form and impose the title of "manager" on someone who was not elected or appointed a manager under the dictates of the LLC Act. Neither the trial court nor the parties have cited one.

¶ 60    Nor do we find any indication in the LLC Act that the General Assembly would have intended this result, and everything to suggest that it did not.  As noted, the LLC Act permits corporations like CHG to be managers. The General Assembly knew the difference between an individual and a corporation. It knew that a corporation is an artificial structure created by individuals, and that "[o]ne of the primary purposes of doing business as a corporation is to insulate stockholders from unlimited liability for corporate activity." *Bank of America v. WS Management, Inc.*, 2015 IL App (1st) 132551, ¶ 99; *Saletech, LLC v. East Baltimore Inc.*, 2014 IL App (1st) 132639, ¶ 25; *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 500 (2005); *Peetoom v. Swanson,* 334 Ill.App.3d 523, 526 (2002). The General Assembly knew, in other words, that the acts of a corporation are not typically imputed to the individual shareholders of that corporation—even closely held corporations. See *Peetoom*, 334 Ill. App. 3d at 526. They are individuals, but they act as a single corporate entity.

¶ 61    So when the General Assembly allowed corporations to be managers, with its understanding of corporate formalities and protections, we find it nearly impossible to believe that it silently intended to include every shareholder of every closely held corporate manager to be, themselves, individually, considered "managers." For us to judicially insert such a provision would be more than re-writing statutory language; it would be inventing it out of whole cloth.

¶ 62     And beyond the General Assembly's silence on that issue is what it *did* expressly provide in the LLC Act. The LLC Act specifically contemplates that a member who is not formally elected a manager might, in fact, exercise the duties of a manager—and to the extent he or she does, that member is charged with a manager's fiduciary duty. See 805 ILCS 180/15-3(g)(3) (West 2012) ("a member who exercises some or all of the authority of a manager and conduct of the company's business is held to the standards of conduct [applicable to a manager]").

¶ 63     So the General Assembly recognized the possibility of a non-manager becoming a *de facto* manager of sorts—yet it only applied that rule to *members* of the LLC. (Nobody claims that Oliver was a member of Combined.) The General Assembly easily could have applied that same principle to the individual shareholders or officers of a closely held corporate manager, but it did not do so. The contrast speaks volumes.

¶ 64     The trial court's reasoning—that CHG was essentially like a partnership, and thus Oliver and the other two shareholders essentially were managers just like CHG itself—calls to mind the somewhat related doctrine of piercing the corporate veil, the idea that, in some instances, an individual shareholder or officer of a corporation can be held individually liable for the actions of the corporation. See, *e.g.*, *Saletech*, 2014 IL App (1st) 132639, ¶ 25. But that doctrine has no application here. Veil-piercing occurs after a successful claim by a plaintiff against the corporate entity, after which the plaintiff tries to penetrate the corporate façade to reach the individual officers or shareholders pulling the levers. *Id.*

¶ 65     That is not our situation. Combined hasn't sued CHG for breach of fiduciary duty and then attempted to pierce CHG's corporate veil to reach Oliver individually. Combined isn't suing CHG at all. CHG didn't take Combined's clients. Oliver did. Combined is suing Oliver directly. So veil-piercing has no application here.

¶ 66    But that does bring us to one final reason that, as a matter of law, Oliver was not a manager of Combined—the Operating Agreement. For one, as we mentioned, that agreement specifies that "CHG is and shall continue to act as manager of [Combined]." But beyond that, Section 7.5 of the Operating Agreement recognizes that a plaintiff might attempt to reach individual shareholders of CHG in a lawsuit—that is, pierce CHG's corporate veil—and provides as follows:

> "7.5.  Liability of Managers. The Manager (*which for purposes of this Section 7.5 and Section 7.6* shall include the Manager's partners, *officers*, directors, *shareholders*, members, managers, employees, agents and affiliates) shall not be liable to any Member or [Combined] for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith …" (Emphasis added).

¶ 67    It's a much longer provision, but the point is that the Operating Agreement specifically noted that CHG's officers and shareholders (that is, Pleason, Isenberg, and Oliver) were only included in the definition of "manager" *for purposes of section 7.5 and 7.6*. That is to say, in any other portion of the Operating Agreement, CHG did *not* include its shareholders, only the corporate entity itself. That only further underscores that the one and only manager of CHG was the corporate entity itself, and not Oliver or the other shareholders individually.

¶ 68    We can thus find no legal support for the conclusion that Oliver was a manager of Combined. (At oral argument, Combined conceded that Oliver was not a manager of Combined; we have analyzed the issue regardless, given the circuit court's ruling.)

¶ 69                              b. Oliver as Officer of Combined

¶ 70    Nor was Oliver an officer of Combined. Although the trial court described Oliver at one point as a "manager/officer of Combined," it never elaborated on the "officer" label. There is no

evidence that Combined had any officers at all. The LLC Act permits manager-managed LLCs to elect officers. See *id*., § 1-30(10). And Combined's Operating Agreement permitted the manager (CHG) to appoint officers. But we have no indication in the record that anyone was ever appointed an officer of Combined—certainly not Oliver. That is consistent with the trial court's finding that "[t]here was very little formal structure at Combined and corporate formalities were oftentimes neglected." Nor, we would add, does Combined try to argue that Oliver was an officer of Combined. For all of these reasons, there is no support in the record whatsoever to hold Oliver to the fiduciary duty of an officer, if any such duty exists.

¶ 71                              c. Oliver as "Agent/Employee" of Combined

¶ 72    Aside from characterizing Oliver as a "manager/officer" of Combined, the trial court further determined that Oliver was an "agent/employee of Combined." The trial court did not elaborate on the "agent" finding, nor does Combined make any argument whatsoever on appeal that Oliver was an "agent." We would note, however, that in determining the right of an employee to compete with his former employer, we have often commingled the terms "employee" and "agent," which is probably why the trial court did. See, *e.g.*, *Prudential Insurance Co. of America v. Sempetrean*, 171 Ill. App. 3d 810, 816 (1988) (referring to defendant interchangeably as "former agent" and "former employee"); *Prudential Insurance Co. of America v. McCurry*, 143 Ill. App. 3d 222, 223, 226 (1986) (same); *Wilborn & Sons, Inc. v. Heniff*, 95 Ill. App. 2d 155, 158, 163 (1968) (same). We will thus consider these two findings as one.

¶ 73    The trial court made a factual finding that "[a]ll of the members of Combined—as well as Isenberg, Pleason, and Oliver—were also employees of the company, and received salary

paychecks." We have no basis to disturb that finding. So Oliver was an employee of Combined. Does that mean he owed Combined a fiduciary duty of some kind or another?

¶ 74    There is some reason to believe he did not. In *800 South Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶¶ 30-35, we held that the LLC Act imposes fiduciary duties only on the manager and, to a limited extent, members, and thus anyone who doesn't fall into one of those categories (there, an officer, a vice president) did not owe a fiduciary duty to the LLC unless the LLC's operating agreement specifically imposed one. The common law, in other words, had no role to play concerning fiduciary duties in manager-managed LLCs. *Id*. ¶ 37 ("Undoubtedly, the Act governs here, not any common-law considerations, since the Act speaks directly to who, and who does not, owe fiduciary duties in the particular and specific context of manager-managed limited liability companies").

¶ 75    If we were to follow *Cadden*, this discussion would be over. The LLC Act obviously imposes no fiduciary duty on employees, nor does Combined's Operating Agreement. Neither the trial court nor Combined has cited any provision to the contrary, and our independent provision reveals none.

¶ 76    But we can sidestep the somewhat controversial notion that all principles of the common law evaporate at the door of the LLC Act, as *Cadden* held, because even if Combined and the trial court were correct that an employee owed a common-law fiduciary duty to Combined, the evidence unequivocally shows that Oliver did not breach such a duty in soliciting Combined's clients to join Oliver's new company, Signature.

¶ 77    We have long and repeatedly recognized that, because " 'our free economy is based upon competition,' " a former employee " 'cannot be compelled to erase from his mind all of the general skills, knowledge, acquaintances, and over-all experience which he acquired during the

- 20 -

course of his employment.' " *Sempetrean*, 171 Ill. App. 3d at 816–17 (quoting *Revcor, Inc. v. Fame, Inc.*, 85 Ill.App.2d 350, 357 (1967)); see also *TAD, Inc. v. Siebert*, 63 Ill. App. 3d 1001, 1005 (1978). Thus, absent a restrictive covenant (to be discussed later), fraud, or the taking of confidential information, former employees "may compete with their former employer and solicit former customers so long as there was no demonstrable business activity by the former employee *before* the termination of employment." (Emphasis added.) *Veco Corp.*, 243 Ill. App. 3d at 160; see also *McCurry*, 143 Ill. App. 3d at 227.

¶ 78    In fact, a current employee may go so far as to "plan, form, and outfit a competing corporation while still working for the employer," as long as the employee doesn't commence actual competition until after leaving that employment. *Veco Corp.*, 243 Ill. App. 3d at 160. As we put it over three decades ago:

> "It is recognized that an employee, absent a restrictive contractual provision, has a right to enter into competition with the former employer upon leaving such employ. [Citation.] Indeed, an employee may legitimately go so far as to form a rival corporation and outfit it for business while still employed by the prospective competitor. [Citation.] An employee is held accountable for breaching his fiduciary duty to his employer *only* when he goes beyond such preliminary competitive activities and commences business as a rival concern *while still employed*." (Emphasis added.) *Voss Engineering, Inc. v. Voss Industries, Inc.*, 134 Ill. App. 3d 632, 635–36 (1985).

¶ 79    That remains the law today. See, *e.g.*, *Northwest Podiatry Center, Ltd. v. Ochwat*, 2013 IL App (1st) 120458, ¶ 60 (recognizing that "employees may plan, form, and equip a competing corporation while still working for their employer" and may ultimately "compete with their

former employers and solicit former customers as long as they did not take any action to do so before termination of their employment.").

¶ 80    Thus, for example, a current employee did not breach his common-law fiduciary duty to the employer when he merely told his current clients of his intention to leave and join a competitor. See *Ellis and Marshall Associates, Inc. v. Marshall*, 16 Ill. App. 3d 398, 402-04 (1973). Because the employee made no attempt to *solicit* those clients or engage in any demonstrable competitive activity until after he left his employment and joined the new venture, the defendant breached no fiduciary duty to his former employer. *Id*. Likewise, a current employee did not breach his fiduciary duty to his employer when he formed a competitor and purchased machinery for that competitor, because he did not commence actual competition with his employer until after he left that job. See *Heniff*, 95 Ill. App. 2d at 163.

¶ 81    In essence, then, an employee can prepare to compete with his employer as long as he does not actively solicit the clients or otherwise commence competition during his employment, and the employee may immediately compete with his former employer the moment the employment relationship has ceased.

¶ 82    Here, Oliver testified that he began to call—that is, solicit—his former clients at Combined on January 2, 2013, two days after his mandatory retirement on December 31, 2013. The trial court accepted that testimony, specifically finding that "Oliver did not solicit any of his accounts or otherwise compete with Combined until after he had retired, at which time he was neither a shareholder/officer of CHG nor an officer/employee of Combined" and that Oliver waited "a couple of days before actively soliciting his accounts to transition their business to Signature."

¶ 83     Under the case law regarding an employee's fiduciary duty, a couple of days is enough time to wait; the relevant point is that the solicitation took place post-employment. As the record shows that Oliver did not actively solicit the clients while still employed by Combined, the evidence unequivocally establishes that Oliver did not breach an employee's fiduciary duty to Combined, assuming one existed at all.

¶ 84     In sum, because Oliver was not a manager of Combined, because he was not an officer of Combined, and because he did not breach any fiduciary he may have owed Combined as an employee, Combined's claim against Oliver for breach of fiduciary fails as a matter of law. The trial court's judgment in favor of Combined on this claim is reversed.

¶ 85                                    2. Fiduciary Duty to CHG

¶ 86     This story is markedly different when it comes to Oliver's fiduciary duties to CHG. Oliver was an officer of CHG, and he was a one-third shareholder. The trial court found that Oliver owed CHG a fiduciary duty both as an officer and as a shareholder in CHG, a closely held corporation. The court was correct on both counts.

¶ 87     An officer owes a fiduciary duty to the corporate employer. See *Ochwat*, 2013 IL App (1st) 120458, ¶ 60. That duty is typically embodied in one of two "well established legal axioms in the area of corporate law: (1) officers and directors of a corporation cannot actively exploit their positions within the corporation for their own personal benefit; and (2) the activities of officers and directors may not hinder or defeat the ability of the corporation to continue the business for which it was developed." *Smith-Shrader Co., Inc. v. Smith*, 136 Ill. App. 3d 571, 577 (1985); see also *H. Vincent Allen & Associates, Inc. v. Weis*, 63 Ill. App. 3d 285, 291 (1978). Saying the same thing slightly differently, as we recently did: "[T]he corporate officer's termination of his former employment does not end potential liability for transactions that began,

or were based on information learned, while the officer was employed." *Ochwat*, 2013 IL App (1st) 120458, ¶ 60; *Veco Corp.*, 243 Ill. App. 3d at 161.

¶ 88    So while employees, who (as we just explained) may act in their own self-interest and *prepare* to compete with their current corporate employer as long as they don't actually commence competition while employed, corporate officers "stand on a different footing." *Veco Corp.*, 243 Ill. App. 3d at 160. They may not actively exploit their positions for a personal benefit while employed; they may not act in their self-interest while employed as an officer. They may privately plan to leave a corporation; they may privately contemplate competing against it in the future; but they may not undertake any activities that would hurt the corporation's ability to continue as a business or exploit their status as an officer in any way, while employed. That includes not using information acquired, while employed as an officer, to one's competitive advantage post-employment. And that information need not rise to the level of a trade secret; it is enough that the information was available to the officer by virtue of his or her position. See *Comedy Cottage, Inc. v. Berk*, 145 Ill. App. 3d 355, 361 (1986); *Smith-Shrader Company, Inc. v. Smith*, 136 Ill. App. 3d 571, 578 (1985).

¶ 89    Thus, for example, a defendant who was the corporation's vice president and general manager, who among other things was entrusted with the negotiations of the corporation's lease renewal, could not use his inside knowledge of the prior negotiations and the circumstances surrounding the termination of that lease to his advantage by resigning and obtaining the lease for himself and the new company he started up. See *Comedy Cottage*, 145 Ill. App. 3d at 360-61. We recognized there that the defendant may not have actually competed—that is, sign the lease for his new company and open the new shop—until after his formal resignation. *Id*. But the

defendant "remained bound by his fiduciary duty because his acquisition of the lease was based upon knowledge acquired during his employment." *Id*. at 361.

¶ 90    Likewise, a former officer of a manufacturer's representative company breached his fiduciary duty by hiring away key personnel from his former company, whom he knew to have specialized skills and knowledge after having worked with them. See *Smith-Shrader*, 136 Ill. App. 3d at 578. The evidence of when the former officer first began soliciting these employees was not entirely clear, but we did "not consider the actual date on which [the] employees were contacted to be indicative of [the former officer's] fairness in approaching them." *Id*. We explained that the former officer's "acquaintance with and knowledge of the ability and specialized training of [these solicited employees] were acquired as a direct result of his association with [the former company]." *Id*.

¶ 91    Oliver says there is no evidence that he undertook any competitive activities whatsoever before he left CHG and Combined. As we already noted above, Oliver said he began his telephone solicitations two days after his retirement—January 2, 2013—and the trial court expressly found that Oliver did not begin his telephone solicitations of his former clients until after his retirement.

¶ 92    But in the trial court's view, that was not the end of the story. The court noted the rather breakneck speed with which Oliver managed to transition these former clients to the new company, Signature: "it was only a matter of days," the court found—more specifically January 10—before Oliver's former clients "had all either transitioned or were in the process of transitioning their business to Signature." The trial court found it difficult to accept that Oliver had not greased the machinery to some extent before his retirement on January 1—short of

outright solicitation, to be sure, but certainly preparing these clients for the possibility that he would be leaving CHG and Combined.

¶ 93     The court based that inference on testimony from the parties. For one, Oliver himself testified that "[g]etting a manufacturer to issue a contract in a new company is a big deal. Some of these companies were significant corporations, and, consequently, to try and change it back or change it to another name would be very, very difficult *** almost impossible." And in an affidavit introduced into evidence, Isenberg claimed that "[o]n average it takes about two years and much effort to successfully develop a new customer line or program to the point where any commissions can be received." And for his part, Pleason testified that he did not believe Oliver could have positioned his lines to transfer so quickly without having talked to them beforehand.

¶ 94     So while there was no direct proof of what Oliver may have done to convert these clients so quickly, and he insists that it was simply based on his longstanding personal relationship with these clients, we cannot say that the inference the trial court drew was so unreasonable as to be against the manifest weight of the evidence.

¶ 95     The trial court also reasoned that Oliver "must have used specific information he had acquired over the years" as a CHG officer. Among other things, he handled all of the contracts and was thus intimately familiar with the contractual terms. The court found that Oliver "took advantage of this" knowledge in soliciting the former clients. Oliver also, in the trial court's view, "knew exactly who to contact and what to say in order to induce accounts to terminate their long standing relationships with Combined and transition their business in such a short period of time to a company that technically did not even exist."

¶ 96     The court further noted that Oliver continued to work at Combined's offices after his resignation on January 1, 2013. Oliver says he was allowed to remain in that office by Combined

(specifically Pleason), but the court rejected that rationale, noting that Pleason did not give Oliver that permission until an email dated January 10. Yet before that time, Oliver had already solicited his former accounts and had followed up with them in an email, from an email account bearing the word "Combined," no less.

¶ 97     On that last point, Oliver is quick to point out that his email account was not technically a corporate email account; it was his personal email, one that he always used, that happened to be styled with his initials followed by the word "Combined"—that is, "maocombined@" followed by the email server's name, which we will not publish. That is a fair point. But it is equally fair to say that his clients wouldn't necessarily understand that distinction. An email coming from the same account Oliver had always used in transacting business with them up until December 31, and which clearly included the word "Combined," could be viewed by his former clients as coming from a Combined-sponsored email account. It could have given the impression that the email Oliver was sending—soliciting his former clients—was approved or ratified by Combined.

¶ 98     And the content of those emails only underscores this notion:

> "As we discussed, this letter is to confirm that the Hardware Division is separating from The Combined Group, LLC and will be called Signature Sales and Marketing. This decision was made in order to direct more assets toward our Saleslink Service Organization, Hardware, and the Farm and Home Division. As we discussed, all personnel working in the Hardware Division will be retained to assure a seamless transition. The reorganization was effective January 1, 2013, and we would appreciate your amending the contract to reflect this change."

¶ 99     Given that Oliver was a former officer with Combined's managing entity, given that he was using the same "Combined" email address he'd always used while employed by Combined,

and given the language of the email itself, a client reading this email could reasonably assume that the split was a *fait accompli* retroactive to January 1, and that Oliver was speaking on personal knowledge and with Combined's concurrence in so announcing. That is to say, a client reading this email would think that Combined didn't even *want* to keep them as clients, that Combined had agreed to let Oliver take them to his new company.

¶ 100   And yet, the court found beyond any doubt that no such deal to split up Combined had been made. The court acknowledged that Oliver might have *believed* that such a deal had been struck, but the court specifically found Oliver's thinking to be objectively unreasonable. Oliver had never been told by either Pleason or Isenberg that a deal to split Combined had been finalized, and Oliver obviously never saw anything in writing to that effect.

¶ 101   And it's not as if it didn't occur to Oliver that he might want to seek confirmation from Pleason or Isenberg. He testified that he didn't take Herman's and Shourd's word for it. So he emailed Pleason and Isenberg for confirmation that a deal had been reached.  They never confirmed or denied. Oliver testified that he took this non-response as confirmation. With the stakes being what they were, with his retirement and future in the balance, we agree with the trial court that Oliver acted objectively unreasonably in simply assuming a deal had been struck without any written confirmation (or even oral confirmation) from the parties with the authority to strike that deal, Isenberg and Pleason.

¶ 102   From these facts, there was sufficient evidence that Oliver undertook actions before he ceased being a corporate officer, and that he exploited his position as an officer before and after he left Combined, to support the trial court's finding that Oliver breached his fiduciary duty to CHG. At a minimum, the trial court's finding was not so arbitrary or unreasonable that the opposite conclusion was clearly evident.

¶ 103   We thus affirm the judgment finding Oliver in breach of his fiduciary duty to CHG.

¶ 104                          B. Damages for Breach of Fiduciary Duty

¶ 105   Since we are upholding the court's judgment as to CHG's claim, we must now turn to damages. Oliver asserts that the court made a legal error by relying on the Restatement to apportion his damages. And even without this error, he claims there was no evidence of the damages directly attributable to him. We disagree that the evidence did not support the court's judgment.

¶ 106   Initially, the court determined that Oliver was jointly and severally liable for the entire $2.3 million judgment in favor of CHG and Combined. After Oliver filed a post-trial motion, the court agreed that he should not be jointly liable. On reconsideration, the court ultimately entered judgment against "Mark Oliver in the amount of $687,514, which represents the portion of the total damages attributable to and which are properly apportioned to Mark Oliver." Oliver contends that this $687,514 is cut from whole cloth and merely represents one-third of the judgment (which includes adjustments which were applied on reconsideration). He argues that the court tried to avoid calculating the damages—which he claims there was no proof for—by merely splitting the judgment three ways.

¶ 107   But the notion that Oliver was responsible for one-third of the total "stolen" business is not contrary to the evidence. Oliver acknowledged that he personally brought in approximately $500,000-$600,000 a year in commissions. He also admitted that he got all his business to transfer to Signature within about the first month of its operations. According to Combined's damages expert, Signature (which would include Oliver's business) took $1.517 million dollars in business based on Combined's 2012 revenues. Simple math tells us that Oliver's $500,000-600,000 in business is equivalent to approximately one-third of $1.517 million.

¶ 108   Using the "raw" numbers for the business taken, their expert then used accepted methodology to arrive at the lost profits and business value. His expert report, as of October 2016, ranged damages from $2.038 to $2.271 million. At trial, due to the passage of time, he testified that it "was at least" $2.3 million. While it is true that the companies' expert did not dissect the evidence account by account, the record supports the conclusion that Oliver was responsible for one-third of the transferred business, and logically, one-third of the damages suffered by Combined.

¶ 109   But we have a problem. The award of $687,514 was based on Combined's damages. And we have just reversed the judgment on Combined's breach-of-fiduciary claim. The only recoverable damages are those suffered by CHG, whose judgment on the breach-of-fiduciary duty claim we have upheld.

¶ 110   It might be tempting to perform this calculation ourselves—that is, to determine what damages, if any, have been proven on *CHG's* breach claim. Combined, as we have noted, was CHG's only asset, and CHG's majority ownership of Combined's share was fixed at 51 percent. Is it as simple as taking 51 percent of the $687,514 figure? Maybe so. But this issue has not been briefed, so out of an abundance of caution, the better course is to remand to the trial court so the parties can brief and argue what damages may or may not have been proven on CHG's claim.

¶ 111                    II. Oliver's Claims Against Pleason and Isenberg

¶ 112   In his own complaint, Oliver claimed that, as shareholders in CHG, Pleason and Isenberg breached their duties by failing to deal with him in the utmost good faith and by wasting corporate assets. The circuit court found in favor of Pleason and Isenberg on each theory. On appeal, Oliver appears to take issue with the ruling on three aspects of his claim: failure to pay his retirement, corporate waste, and the failure to communicate.

¶ 113   Because Oliver challenges the judgment on the proofs, we will reverse only if the judgment is against the manifest weight of the evidence. See *Reliable*, 2011 IL 111871, ¶ 12.

¶ 114                                     A. Failure to Pay

¶ 115   We begin with the failure to pay him for his CHG share and the deferred payout. What Oliver's argument fails to recognize is that this entire case hinged on the parties' interpretation of the Operating Agreement and the decision to "amicably" split the company. In his brief, Oliver appears to ignore that Pleason and Isenberg had legitimate reasons for believing that they did not have to pay the Deferred Payout or compensation for his CHG shares.

¶ 116   For one, the circuit court held that the Operating Agreement liquidated Oliver's interest in CHG in return for the Deferred Payout, and thus there was no basis to claim payment for his shares of CHG. And factually speaking, Oliver unquestionably competed with Combined and CHG, in violation of section 8.6 of the Operating Agreement. Because that section allowed CHG to cease any Deferred Payout payments to Oliver if Oliver violated the noncompete clause, Pleason and Isenberg were at least justified in their initial refusal to pay.

¶ 117   Of course, the trial court ultimately found that noncompete covenant unenforceable because it was too broad. But that's hindsight. And there is no question that Oliver was violating that noncompete provision, regardless of whether a trial court would one day invalidate it. It was reasonable, in other words, for Pleason and Isenberg to rely on section 8.6 to deny Oliver his Deferred Payout payments. We cannot say that the trial court's judgment on this claim was arbitrary or unsupported, or that the opposite conclusion was clearly evident.

¶ 118                                     B. Failure to Communicate

¶ 119   Tangential to the payment issues, Oliver argues that Pleason and Isenberg's failure to communicate with him shows that they did not act with the utmost good faith. The circuit court

agreed that each of the three shareholders' "conduct was certainly inconsistent with [their] duties to act openly and honestly with one another." But it found that Oliver failed to prove damages from a breach of this duty. To support damages, Oliver argued that they lulled him into thinking there was a deal to split the company. The circuit court found this position to be "entirely unconvincing" because Oliver himself acted unreasonably in assuming there was a deal without any confirmation, written or oral, from either Pleason or Isenberg. The circuit court's judgment was not against the manifest weight of the evidence.

¶ 120                                C. Corporate Waste

¶ 121    Finally, the corporate-waste argument. Oliver attempted to show that Pleason and Isenberg were improperly using corporate money by paying third parties and writing themselves checks. The court found that Pleason and Isenberg's explanation for these expenditures was credible. And on their face, we cannot disagree with that assessment.

¶ 122    Pleason and Isenberg testified that these payments were either for reimbursement of expenses or for legitimate consulting services. The court did not believe Oliver's theory about the payments and thought it was "worth noting that Oliver's 'suspicions' suddenly arose only after his relationships with Isenberg and Pleason had severely deteriorated." We have no basis to second-guess the trial court's judgment on this point.

¶ 123    Though we have said enough, we would add that the claim of improper payments to one vendor in particular, Market Vision, appears to have been previously dismissed from the case. Earlier in the litigation, a different judge had dismissed Oliver's allegations of "commercial bribery," which concerned payments to Market Vision and its president. As far as we can discern, those claims remained dismissed and never should have been part of the trial.

¶ 124   This brings us to Oliver's final argument on this issue. He claims that the circuit court—the judge who dismissed the bribery claims—erred by not allowing discovery on those same claims. Specifically, the circuit court granted a motion for protective order on a subpoena to Market Vision's president. Trial courts have broad discretion regarding protective orders. *Payne v. Hall*, 2013 IL App (1st) 113519, ¶ 12. We will reverse its decision "only if it acts arbitrarily, without the employment of conscientious judgment, exceeds the bounds of reason and ignores recognized principles of law; or if no reasonable person would take the position adopted by the court." *Id*.

¶ 125   Here, Pleason and Isenberg moved for a protective order, arguing that the claim to which the evidence was relevant had already been dismissed. And Oliver didn't really challenge that argument. Instead, in his response to the motion to quash, he argued it was relevant to breach-of-contract and failure to allow inspection claims—*not* his breach-of-fiduciary-duty claim. It is not until his brief on appeal that Oliver even suggests that the MarketVision payments were still a part of Count III.

¶ 126   So we're not sure where his argument about this subpoena gets him. But in any event, we will say this much: We don't know why the trial court ruled as it did, because we lack a transcript of the proceeding. It is next to impossible to find an abuse of discretion in the trial court's holding when we lack a transcript to tell us the trial court's reasoning. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984) ("As there is no transcript of the hearing on the motion *** here, there is no basis for holding that the trial court abused discretion in denying the motion."); *Webster v. Hartman*, 195 Ill. 2d 426, 433–34 (2001) (reviewing court presumes order was in conformity with law and facts absent transcript of proceedings to explain trial court's reasoning). We have no basis to find error in that ruling.

¶ 127                              III. The Cross-Appeal

¶ 128    Turning to the cross-appeal, CHG and Combined first argue that the court erred by finding the non-compete provision of Section 8.6 unenforceable as a matter of law. They also contend that the court's judgment in favor of Oliver on their conspiracy and aiding and abetting claim is against the manifest weight of the evidence. Finally, they argue the court abused its discretion by not awarding them attorney's fees incurred in defending Oliver's shareholder oppression claims.

¶ 129                         A.  Non-Compete Provision

¶ 130    As their primary argument on appeal, CHG and Combined challenge the court's decision that the non-compete provision was unenforceable. Alternatively, they claim that the court should have exercised its authority to modify the provision.

¶ 131    The interpretation and legal effect of a contract is a question of law reviewed *de novo*. *Mermelstein v. Menora*, 372 Ill. App. 3d 407, 411 (2007). The rules of contact interpretation are well settled. Our primary goal is to effectuate the intention of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). First, we look to the language of the contract to determine the parties' intent. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). We view the provisions of the contract as a whole and in light of the other provisions. *Id*. "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Id*. If the language is susceptible to multiple interpretations, it is ambiguous, and extrinsic evidence may be introduced to aid in determining the parties' intent. *Id*.

¶ 132    Because they restrict trade, non-compete restrictive covenants are "carefully scrutinized." *McInnis v. OAG Motorcycle Ventures, Inc.*, 2015 IL App (1st) 142644, ¶ 26. We will only enforce reasonable restrictions. *Id*. A post-employment restrictive covenant "is reasonable only if

the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable*, 2011 IL 111871, ¶ 17. It is well established that total restraints on trade are void as against public policy. *Id.*; *Hursen v. Gavin*, 162 Ill. 377, 380 (1896)). Instead, restrictions must be "narrowly tailored to protect only against activities that threaten the employer's interest." *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 452 (2007).

¶ 133     As a refresher, the provision in question in the Operating Agreement provides:

"Each CHG Shareholder and Member (other than CHG) hereby agrees on behalf of himself and his Affiliates that following his Retirement and for so long as he receives the Deferred Payout, he and his Affiliates will not directly or indirectly, either individually or as a principal, shareholder, member, partner, joint venture, investor, employer, director, manager, officer, employee, consultant, agent, or in any other manner or capacity whatsoever, engage in, assist, or have any active interest in any business located anywhere in the United States that engages *in any aspect of the Company's business* (as described in Section 2.4(a) hereof or as it shall develop from time to time)." (Emphasis added.)

¶ 134     As shown above, for its description of "the Company's business" in that last italicized phrase, the provision directs the reader to section 2.4 of the Operating Agreement (it actually says "2.4(a)," but there is no such provision, and all agree that "2.4" was intended). Section 2.4 provides in relevant part as follows:

"Character of the Business. The purpose of the Company shall be to represent multiple global manufacturers, distributors and their products to various channels of distribution

within exclusive territories and/or exclusively to specific accounts throughout North America (the "**Business**"), and to engage in any one or more enterprises, ventures, undertakings and businesses permitted under the Act." (emphasis in original).

¶ 135   The trial court found this provision unreasonable and unenforceable because, based on the provision's italicized language above and its cross-reference to section 2.4, the provision "precludes a retiring Combined member of CHG shareholder from working at *any* manufacturer's representative company in *any* manner whatsoever." (Emphasis in original.)

¶ 136   The trial court was correct. There is nothing unclear or ambiguous about this provision. The prohibition extends to working for any business that engages in "any aspect of the Company's business." And the "Company's business," as described in section 2.4, is "represent[ing] multiple global manufacturers, distributors and their products to various channels of distribution"—in other words, the business of a manufacturer's representative company. Put it together, and the provision does exactly what the trial court said—it prohibits, for five years, a Combined member or CHG shareholder from working for any business that engages in manufacturer's representation. It is nothing short of a total restraint on trade and is thus unenforceable as a matter of law.

¶ 137   CHG and Combined first argue that the court failed to properly interpret the term "aspect." In their view, this term is synonymous with "facet" and refers only to the *types* of businesses that Combined represented—hardware, electronics, etc. Essentially, in their view, the plain language of Section 8.6 only prohibits Oliver from soliciting accounts relating to these "aspects" of the business but would not prevent Oliver from being a manufacturer's representative for a different line of products.

¶ 138   True, the parties testified that this was their intention. But that is manifestly not what the language says. It never hints at the products that Combined represents; it specifically directs the reader to section 2.4 for a description of Combined's "business." As we have said, when the language is unambiguous, we interpret it as written. *Thompson*, 241 Ill. 2d at 441.

¶ 139   CHG and Combined further argue that this interpretation renders the remainder of the phrase, "as it shall develop from time to time" superfluous. That language, they say, supports the view that the "Company's business" refers to the products Combined represents, which would "develop from time to time." There would be no reason for this qualifier, they say, if the prohibition were on the entire industry of manufacturer's representation.

¶ 140   But that argument ignores the last sentence in section 2.4 as quoted above, which provides that Combined may "engage in any one or more enterprises, ventures, undertakings and businesses permitted under the Act." That's about as broad as language gets, and it suggests that Combined one day might choose to be more than a manufacturer's representative.

¶ 141   Putting it together, then, when the non-compete provision referred to "the Company's business *** as it shall develop from time to time," it was merely recognizing the possibility that Combined might one day venture beyond its current role as a manufacturer's sales representative.

¶ 142   The companies' last point on this issue is that the court should have exercised its discretion and modified the provision. They argue:

> "Alternatively, we argued, the Chancery court has the power to modify the restriction
> under the 'blue pencil' doctrine. Citing *Sheehy v. Sheehy*, 299 Ill. App. 3d 996, (1st Dist.
> 1998), Judge Mullen recognized that the court had the power to modify the restriction,
> but declined to exercise its discretion to do so. (A 76) While the covenant should be read

as we suggest – to carry out the parties [*sic*] shared understanding – alternatively, the trial court should have modified the restriction to the four focus areas and found Oliver violated its provisions."

¶ 143   That is the entire "argument" on this point. Although they claim the "blue pencil" doctrine is *discretionary*, they have not provided this court with any case law or argument as to how the court may have abused that discretion. Nor any guiding law about when a court should, or should not, exercise such discretion. We are entitled to a coherent argument and citation to pertinent authority; this court is not "a repository into which an appellant may foist the burden of argument and research." *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). Because the argument is completely undeveloped, we decline to review it further. *Id.*

¶ 144                                     B. Conspiracy and Aiding and Abetting

¶ 145   Turning to their other claims, the circuit court found that Herman and Shourd participated in a conspiracy to steal business from Combined. However, it found that Oliver was not part of their conspiracy and did not knowingly aid and abet Herman and Shourd. As to the conspiracy, it found that Oliver did not have the same "meeting of the minds" because Oliver agreed to join them "only" if they could reach an agreement with Pleason and Isenberg. For the aiding and abetting, it found that "the evidence did not sufficiently establish that Oliver *knew* his actions were a part of Herman and Shourd's scheme." It found that Oliver's "careless and negligent" actions were not sufficient to find that he knowingly aided and abetted.

¶ 146   A civil conspiracy consists of two or more persons, who through some concerted action, agree to accomplish either an unlawful purpose or a lawful purpose through unlawful means. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 63 (1994). "While a civil conspiracy is based upon intentional activity, the element of intent is satisfied when a defendant knowingly and voluntarily

participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Id*. at 64. A defendant is liable as a co-conspirator if it "understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives." *Id*.

¶ 147   The question is whether the court's finding of fact that Oliver *didn't* agree to the same scheme is against the manifest weight of the evidence; that the opposite conclusion is apparent, or the judgment is unreasonable, arbitrary or not based on the evidence. *Abbas*, 2018 IL App (1st) 162972, ¶ 41. We agree that the court found that there was an agreement between Oliver, Herman, and Shourd. The problem is, Oliver's agreement with them was premised on a deal between Pleason, Isenberg, Herman, and Shourd. So, while Oliver *agreed* with Herman and Shourd, his agreement with them was *not* an agreement to be part of the conspiratorial scheme. Quite the opposite: the evidence shows that Oliver was under the belief that there was a deal to split the company—Herman and Shourd certainly told him that this was the case. While Oliver's actions were consistent with and, in fact, assisted Herman and Shourd's conspiracy, it was not because Oliver *agreed* to be a part of it. This distinction is why the court found in Oliver's favor.

¶ 148   The court also found that Oliver did not aid and abet Herman and Shourd for essentially the same reason: he didn't *know* he was assisting their scheme. To find someone liable for aiding and abetting, the defendant must be aware of his role in the tortious activity and then knowingly and substantially assist in the conduct. *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 28-29 (2003). But as we've discussed above, the circuit court did not find that Oliver *knew* that Herman and Shourd were running a scheme—he believed there was a deal to split the company.

¶ 149   In their argument, the companies claim that there is no question that Oliver knew he was assisting Herman and Shourd. Again, yes. There is no question that Oliver knew he was going to

transfer his accounts to Signature and that his actions substantially assisted Herman and Shourd. But, much like the conspiracy claim, the court found that Oliver was not aware that he was assisting any *wrongdoing*. He knew he was helping them, but the court believed he did so *only* because he thought there was a deal.

¶ 150    In essence, the court's judgment on these two claims comes down to one simple finding of fact: Oliver genuinely (if unreasonably) believed there was a deal to split Combined because Herman and Shourd repeatedly told him as much. Although the court chastised Oliver for being "careless and negligent" about finding out whether Herman and Shourd's representations were true, it did not change the genuineness of Oliver's belief. Because the record supports the court's findings, its judgment in favor of Oliver on the conspiracy and aiding-and-abetting claims are not against the manifest weight of the evidence.

¶ 151                                  C. Attorney Fees

¶ 152    As the final argument, Pleason and Isenberg claim the court erred in denying their motion for sanctions. The Illinois Business Corporations Act allows a party to recover their attorney's fees if the court finds that a party to certain proceedings "acted arbitrarily, vexatiously, or otherwise not in good faith." 805 ILCS 5/12.60(j) (West 2018). The court's decision to grant fees is reviewed for an abuse of discretion. See *Machnicki v. Kurowski*, 2018 IL App (1st) 171077, ¶ 32. A court abuses its discretion only if the decision is arbitrary, fanciful, or where no reasonable person would adopt the same view. *TruServ Corp. v. Ernst & Young, LLP*, 376 Ill. App. 3d 218, 227 (2007).

¶ 153    The circuit court stated that it "cannot conclude that Oliver acted arbitrarily, vexatiously, or otherwise not in good faith in bringing his shareholder oppression and corporate waste claims under section 12.56." Pleason and Isenberg claim the court erred because "[i]t is beyond question

Oliver's shareholder suit was his vendetta." But while the circuit court noted that the timing of Oliver's suspicions was, itself, suspicious, it also found that those same claims did not warrant attorney fees under Section 12.60. Pleason and Isenberg's argument on this point essentially asks us to re-do the calculus and determine that Oliver's claims *did* warrant fees.

¶ 154   But that is not the standard. We cannot review the circumstances and make an independent determination. Even if we believed Oliver's conduct warranted fees, the circuit court did not—the same circuit court that, in meticulous detail, reviewed all the evidence and circumstances of Combined's break-up. For one, the court found that Pleason and Isenberg's conduct *did* breach a duty of good faith to Oliver. The claim only failed for lack of damages. And while Oliver's suspicions may have been self-serving, they weren't completely fanciful. He had legitimate concerns—apparently shared by Herman and Shourd as well. The fact that the circuit court did not believe or share his concerns does not mean his claims warrant sanctions under Section 12.60(j). In short, Pleason and Isenberg have not presented any argument to demonstrate that the circuit court's decision was so unreasonable as to constitute an abuse of discretion.

¶ 155                                          CONCLUSION

¶ 156   The trial court erred when it found that Oliver breached a fiduciary duty to Combined. We reverse that ruling and remand to the trial court to recalculate the damages due to CHG. We affirm the court's judgment in all other respects.

¶ 157   Affirmed, in part; reversed in part; remanded.